UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JACOB ISRAEL BOSSIRA, individually; JACOBS POWER LTD, a private company incorporated in Israel,<br>Plaintiffs,<br>-against-<br>THE STATE OF ISRAEL, ET AL.,<br>Defendants. | 26-CV-1700 (LTS)<br>ORDER OF DISMISSAL |

LAURA TAYLOR SWAIN, Chief United States District Judge:

Plaintiff Jacob Israel Bossira, who is a resident and citizen of the State of Israel, brings this *pro se* action on his own behalf and on behalf of Jacobs Power Ltd., alleging that Defendants conspired to violate his rights. He sues numerous defendants, many of whom are located in Israel. By order dated March 3, 2026, the Court granted Plaintiff's request to proceed *in forma pauperis* ("IFP"), that is, without prepayment of fees.

Plaintiff initiated this action on March 2, 2026, by filing a complaint that included multiple "emergency" motions. (ECF 1.) By order dated March 5, 2026, the Court denied Plaintiff's motions, including his motion for preliminary injunctive relief. (ECF 4.)[1] On April 23, 2026, Plaintiff filed a motion seeking an extension of time to effect service and reconsideration of the Court's previous denial of his request for pro bono counsel. (ECF 5.) The Court denied those requests by order dated April 24, 2026. (ECF 6.) On May 27, 2026, Plaintiff

[1] The Court's order also warned Plaintiff that if he continued to file nonmeritorious motions seeking preliminary emergency relief, the Court may direct him to show cause why he should not be barred from filing further motions without first obtaining permission to file from the court. (ECF 4, at 7.)

filed a motion seeking (1) an extension of time to file an amended complaint;[2] (2) a temporary stay of "all proceedings pending resolution of this motion"; and (3) appointment of counsel. (ECF 7, at 2.) By order dated May 29, 2026, the Court denied Plaintiff's motions, and stated that, if Plaintiff wanted to file an amended complaint, he could do so within 30 days of the date of that order. (ECF 8.)

Between June 28, 2026, and July 13, 2026, Plaintiff filed a 168-page amended complaint (ECF 9)[3]; an "emergency motion to expedite screening due to immediate irreparable harm" (ECF 10); a motion to proceed IFP filed on behalf of purported new Plaintiff Jacobs Power Ltd. (ECF 11); a motion seeking "expedited screening" and "an immediate ruling" (ECF 12); a "preliminary statement" (ECF 13); and an "urgent supplemental notice of newly-developed . . . evidence of obstruction of justice" (ECF 14). By order dated July 14, 2026, the Court construed Plaintiff's motions at ECF 10 and ECF 12 as a motion for preliminary injunctive relief, and denied the motion. (ECF 15.)

On August 30, 2026, Plaintiff, without a directive from the Court, filed a 414-page second amended complaint. (ECF 16.)

The Court dismisses the second amended complaint for the reasons set forth below.

## STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also

[2] The Court had not directed Plaintiff to file an amended complaint.

[3] In the amended complaint, Plaintiff also sought, for the first time, to assert claims on behalf of Jacobs Power Ltd.

dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted). But the "special solicitude" in *pro se* cases, *id*. at 475 (citation omitted), has its limits—to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible—not merely possible—that the pleader is entitled to relief. *Id.*

**BACKGROUND**

Plaintiff Jacob Israel Bossira ("Plaintiff") brings this action on his own behalf and on behalf of Jacobs Power Ltd. Plaintiff alleges that Jacobs Power is a "private holding company registered in Israel, whose business is any lawful business as defined by law."[4] (ECF 16-1, at 5.)

---

[4] Plaintiff includes more than 200 pages of attachments describing the structure and various activities of Jacobs Power Ltd. (*See generally* ECF 16-30 through ECF 16-61.) Among

Plaintiff asserts claims under the civil enforcement provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Among the named Defendants are: (1) the Development Corporation for Israel (d/b/a Israel Bonds); (2) the State of Israel; (3) the Israel Electric Corporation ("IEC"); (4) the Histadrut (General Federation of Labor); (5) Na'amat ("the women's arm of the Histadrut"); (6) numerous Israeli government officials including the Attorney General of Israel, the former President of the Supreme Court of Israel, various Israeli judges, officials within the Israeli Ministry of Justice, the Minister of Finance, and Governor of the Bank of Israel; (7) Israeli ministries, including the Ministry of Health and Ministry of Welfare; (8) various Israeli municipalities; (9) OPC Energy LTD.; (10) Siemens AG, Siemens Energy, and Siemens USA; (11) Bank Yahav for Government Employees Ltd.; (12) Bank Mizrahi-Tefahot Ltd.; (13) the Israel Bar Association; (14) JPMorgan Chase & Co.; (15) Goldman Sachs Group, Inc.; (16) Bank of America; (17) Barclays Plc.;

---

Jacobs Power Ltd.'s various divisions are: (1) an "R&D/Engineering Division" that "supports all sovereign systems and provides external engineering services to nations, corporations, and institutions" (ECF 16-36, at 1); (2) a "Food & Catering Division" that, among other things, engages in "[c]entralized food production," operates industrial kitchens, provides nutritional planning services, and "food logistics" (ECF 16-38); (3) a "National Energy Division" that engages in "[c]hemical fuel production," marine, solar, geothermal, and wind energy production (ECF 16-40, at 1); (4) a "National Water Division" that engages in water production, purification, desalination, distribution, storage, and quality control (ECF 16-41); (5) a "National Medical Systems Division" that creates "treatment pods" in shopping malls that are used to treat psychiatric conditions, addictions, sleep disorders, weight-related conditions, and emotional and cognitive issues (ECF 16-44); (6) a "National Computing & Communications Division" that produces "AI-driven firmware" for use in computers, smartphones, and "[r]obotic brain modules." (ECF 16-45, at 6); (7) a "National Manufacturing Division" that maintains "[f]ully automated factories," "[a]utonomous production lines," and "[h]igh-precision fabrication systems" (ECF 16-47, at 1); (9) a "National Robotic Construction Systems Division" that "serves as a sovereign authority for all robotic construction, autonomous building, and structural automation systems" and "replaces all traditional construction labor, all human building processes, and all legacy construction companies" (ECF 16-48, at 1); and (10) a separate "National Robotic Agriculture & Automated Gardening Division" that covers "all robotic agriculture, automated gardening, and autonomous land-management systems." (ECF 16-49, at 1).

(18) Deutsche Bank AG; (19) BNP Paribas; (20) UBS AG; (21) NSBC Holdings Plc.; (22) Wells Fargo and Company; (23) RBC Capital Markets, LLC; (24) Jefferies LLC; (25) Mizuho Securities USA LLC; (26) Nomura Securities International, Inc.; (27) the Bank of New York Mellon; (28) Computershare Trust Company, N.A.; (29) the American Psychiatric Association ("APA"); (30) Novartis International AG; (31) Johnson & Johnson (Janssen); (32) Eli Lilly and Company; (33) Pfizer Inc.; (34) Teva Pharmaceutical Industries Ltd.; and others. (*See* ECF 16, ECF 16-3.

Plaintiff asserts that he and Jacobs Power Ltd. are

> victims of an ongoing, organized, and systematic pattern of racketeering activity carried out by a network of institutions, bodies, and individuals (the "Enterprise"), acting in coordination and divided roles for over two decades, with the purpose of preventing Plaintiff from developing, producing, and marketing groundbreaking energy technology (Nexus-12), while stealing intellectual property, blocking access to the energy marker in Israel and the United States, seizing state assets, and defrauding American investors of billions of dollars.

(ECF 16, at 3.)

Plaintiff alleges that the "Enterprise" consists of "three interconnected Sub-Enterprises, each with its own structure, economic motive, and operational arms, but all united under a single overarching goal: preventing Plaintiff from developing, producing, and marketing Nexus-12." (*Id.* at 4.) The first "sub-enterprise," the "Energy Sub-Enterprise," is "led by the Histadrut (General Federation of Labor)," and includes "the Israel Electric Corporation (IEC), the Ofer brothers group (through OPC Energy Ltd. and Kenon Holdings), Bank Mizrahi-Tefahot, Bank Yahav, government regulators (Ministry of Infrastructure, Ministry of Finance, Electricity Authority), and Siemens AG." (*Id.*) Its "purpose" is to "preserv[e] the energy monopoly, prevent[] competition from Nexus-12, and ensur[e] continued capital raising in U.S. markets through false SEC filings and fraudulent bond offerings." (*Id.*)

The second "sub-enterprise," the "Welfare-Clinical Sub-Enterprise," is led by "welfare authorities" and includes "social workers, A.D.N.M. Diagnostic Services, Clalit Health Services, the Ministry of Health, the American Psychiatric Association (APA), and pharmaceutical corporations (Novartis, Johnson & Johnson, Janssen, Eli Lilly, Pfizer, Teva, and others)." (*Id.*) The "purpose" of this sub-enterprise is "extracting systemic profits from false diagnoses, forced psychiatric treatments, out-of-home placements (NIS 1.3 billion annually), and expanding [the Diagnostic and Statistical Manual of Mental Disorders ("DSM")] criteria for commercial gain." (*Id.*)

The third "sub-enterprise," the "Enforcement Sub-Enterprise" is "led by Na'amat (the women's arm of the Histadrut)." (*Id.*) It is the "operational bridge between the Energy and Welfare-Clinical Sub-Enterprises" and includes "the Israel Police, the Legal Aid Bureau, the Family and Juvenile Courts, the Rabbinical Courts, the Execution Office, and the Israel Bar Association." (*Id.*) Its purpose is "neutralizing opponents through false complaints, fabricated welfare proceedings, biased judicial decisions, illegal enforcement, and denial of access to courts." (*Id.*)

These three sub-enterprises are connected through "three institutional 'bridges.'" (*Id.*) Bank Yahav—which is jointly owned by the Histadrut and Bank Mizrahi-Tefahot and "controlled" by the "Ofer-Wertheim group"— is the "financial bridge." (*Id.*) Siemens AG forms the "industrial bridge," by "connecting IEC and OPC through equipment supply (turbines, systems)." (*Id.*) It "has a direct economic interest in preserving the existing marker structure to maintain its U.S. stock value." (*Id.*) Na'mant is the "operational bridge" that "connect[s] police, welfare, and courts through coordinated action against Plaintiff." (*Id.*)

Plaintiff alleges that the Enterprise has caused him "catastrophic damages," including

> blocking of bank accounts in amounts of tens of millions of shekels; coercive collection of NIS 45,000 under threat of imprisonment,[5] without a valid court order; monthly deductions of NIS 2,400 for years, without a valid court order; loss of technologies (Nexus-12) and patents valued at hundreds of billions of dollars; separation from children for two years—as a pressure tactic, not a family matter; administrative of psychiatric drugs (Ritalin) without consent—as a tool of silencing and sedation; false arrests and subhuman detention conditions; frustration of litigation; denial of legal representation; fraud against American investors through concealment of material information in bond offerings; destruction of intellectual property, business files, prototypes, and trade secrets; violation of fundamental constitutional rights—access to courts representation, property, parenthood, due process.

(*Id.* at 4-5.)

Plaintiff defines the Enterprise's objectives as:

> (a) Preserving Israel's energy monopoly by preventing the entry of competing technologies, in particular the Nexus-12 technology developed by Plaintiff; (b) Transferring state assets to the Ofer family at floor prices through closed institutional mechanisms; (c) Financing the mechanism through bond offerings in the U.S. while defrauding American investors; (d) Blocking Plaintiff's ability to compete, expose, and realize his rights; (e) Extracting direct and indirect financial profits from the mechanism; (f) Exploiting the welfare system and the psychiatric diagnostic system to turn children into 'patients' for the purpose of channeling budgets to institutions, and using them as weapons against opponents.

(*Id.* at 14.)

Plaintiff also describes various adverse events in his life over the past 25 years, largely related to his business ventures and his divorce and family court proceedings. All events described occurred in Israel.

Plaintiff developed Nexus-12, a "clean electricity generation technology . . . which threatened to zero out the value of the Israel Electric Corporation, topple the power of the workers' committee, collapse the Histadrut economically, and render OPC, Siemens, and the

[5] The Court understands "NIS" to be a reference to Israeli New Shekels.

entire energy monopoly worthless."[6] (*Id.* at 16.) In 2000, shortly after presenting his technology to Israeli government officials, Plaintiff was fired from the IEC "without cause." (*Id.*) The IEC "retroactively forged the date on the termination letter, and subsequently changed its version, creating an irreconcilable contradiction," which Plaintiff maintains constitutes "mail fraud, wire fraud, [and] obstruction of justice." (*Id.*)

In 2002, Plaintiff filed a petition to the Israeli Supreme Court in which he presented his energy technology. The court "summarily dismissed" the petition "without a response from the State and without a hearing," which Plaintiff alleges violated Israeli law. (*Id.*) Plaintiff further alleges that the "entire casefile disappeared" from legal databases "indicat[ing] an archival act of concealment, deletion, or improper registration." (*Id.* at 17.)

Plaintiff's company, Jacobs Power Ltd., was involved as the "sole buyer of rights to the AMBO Project," an "international energy, infrastructure, and transportation initiative developed by AMBO LLC," which is a corporation headquartered in Pound Ridge, New York. (*Id.*) In 2016, Plaintiff met with the Governor of Mississippi in Tel Aviv to discuss "establishment of manufacturing facilities for Nexus-12 technology in Mississippi," but Defendants "obstruct[ed]" this project. (*Id.*)

Beginning in 2007, an Israeli family court ordered Plaintiff to pay child support, a judgment that Plaintiff alleges was later "voided" (*Id.*) The NII attempted to open multiple "Execution Files" based on the voided judgment, which were subsequently closed because the judgment was void. As a result of the attempts to collect on the voided judgment, "Plaintiff's

---

[6] Plaintiff asserts that Nexus-12 "completely eliminates air pollution from fuel combustion and energy production. It does not merely reduce emissions—it prevents them entirely." (ECF 16-17, at 2.) By "blocking" this technology, Defendants "intentionally caused . . . the continuation of mass death." (*Id.*)

accounts were repeatedly seized, he was prevented from opening a bank account, he could not obtain a credit line, could not present an active account to Gazprom (the Russian energy company), and was prevented from participating in tenders and realizing transactions worth billions of dollars." (*Id.* at 18.)

In 2006, Plaintiff's then-wife filed a criminal complaint against Plaintiff "under pressure from Na'amat." (*Id.*) As a result of this allegedly false criminal complaint filed against Plaintiff by his then-wife, Plaintiff was placed under house arrest for 15 days and subject to a restraining order from his home and children. (*Id.*)

As a result of further family court proceedings, Plaintiff's company's bank account was blocked by Bank Mizrahi, his vehicle was confiscated, and he was prohibited from leaving Israel. (*Id.* at 19.) Plaintiff alleges that the judge relied on improper documents in making these decisions. (*Id.*)

Plaintiff alleges that he was prevented from having "meaningful contact" with his children for approximately two years because of "a deliberate 'Italian strike' by social workers aligned with the Histadrut and/or Social Workers' Union, who informed the court that 'there is no possibility to appoint a social worker' to prepare the [unspecified] report." (*Id.*) Plaintiff asserts that this statement "did not reflect genuine unavailability," but was rather a "coordinated action" to delay the proceedings and "prolong Plaintiff's separation from his children as a pressure tactic." (*Id.*) Plaintiff asserts that the judge "displayed a consistent pattern of favoring women," which he believes "align[s]" with the "positions" of Na'amat and Histadrut. (*Id.*) Plaintiff filed complaints with the Commission for Public Complaints Against Judges, but those were dismissed.

Plaintiff asserts that his divorce proceedings, which appear to have occurred between 2006 and 2009, were "directed to the Rabbinical Court in Netanyahu," despite a lack of jurisdiction. (*Id.*) Plaintiff challenged a document in the court file and complained to the police, the Commission for Public Complaints Against Judges, and the Legal Aid Bureau to no avail. In the course of the divorce proceedings, Judges Zamir and Shindler "ordered Plaintiff's physical incarceration," restricted his bank accounts, and imposed a lien on him. (*Id.*)

Between 2008 and 2012, child support was collected from Plaintiff, which he maintains was improper. (*See id.* at 20.)

Israeli Legal Aid attorneys refused to pursue a tort claim on Plaintiff's behalf, and allegedly lost his case file. (*Id.*) Plaintiff asserts that "[a] complaint to the Public Inquiries Unit was rejected on false grounds." (*Id.*) Plaintiff was subsequently able to file an "administrative petition" to Judge Avraham Elyakim—apparently to seek return of his case file—which was dismissed by the judge, an action Plaintiff describes as "fraudulent concealment" and "denial of access to courts." (*Id.*)

At some point between 2010 and 2016, Plaintiff's ex-wife again attempted to collect child support payments, allegedly based on "an expired judgment." (*Id.*) Plaintiff's ex-wife also filed another "false complaint of violence" against him. (*Id.* at 21.) Plaintiff was "acquitted, but no costs were awarded." (*Id.*)

Between 2010 and 2011, the Rabbinical Court "refused to hear" a tort claim filed by Plaintiff "for frustration of international projects, theft of professional materials, harm to patents, and loss of investments" arising from his divorce. (*Id.*)

At some point between 2013 and 2016, Plaintiff was awarded judgment in a tort claim against his ex-wife "for damages caused by the exit ban." (*Id.*) In September 2016, however, a

judge "canceled the judgment" based on "false allegations" and Plaintiff's appeals were denied. (*Id.*)

Between 2013 and 2016, Plaintiff accused his ex-wife of throwing a "wall clock" at their daughter and filed a claim for custody of the child. (*Id.*) A judge appointed a guardian ad litem for the child and transferred the case to the Juvenile Court, which Plaintiff asserts that the judge had no jurisdiction or authority to do. Plaintiff complains about the actions of the judges and social workers throughout the proceedings. His appeal was dismissed. (*Id.*)

Between 2018 and 2021, Plaintiff's son and daughter were prescribed Ritalin, apparently with the consent of the children's guardian ad litem, but without Plaintiff's consent. (*Id.* at 22.) Plaintiff blames the DSM, the APA, and the medical profession writ large for overprescribing medication. He asserts that "the use of Ritalin and DSM diagnoses was not intended to treat the children," but rather "was intended to send a message to Plaintiff." (*Id.* at 23.)

Plaintiff asserts that the Israel Bar Association "whitewashed complaints against attorneys, blocked investigations, and provided institutional protection" to judges and attorneys. (*Id.*) Furthermore, the "Bar Association's control over judicial appointments ensured" that no Israeli judge would ever hear Plaintiff's challenges to the "Enterprise." (*Id.*)

Plaintiff attempted to "deliver an official notice to the American authorities regarding the pattern of false representations, violations, and ongoing fraud by [the State of Israel] and its agents in the American capital market." (*Id.* at 24.) Plaintiff appears to have alleged that the State of Israel and IEC presented "American investors [with] false representations regarding the integrity of the legal, welfare, and enforcement systems" in Israel. (*Id.*) In particular, Israel's statements "regarding its adherence to the rule of law, human rights, and international conventions [] stand in stark contradiction to its actual conduct as described in this Complaint."

(*Id.*) The notice, however, was not forwarded to the Securities and Exchange Commission or "appropriate American authority" as Plaintiff hoped but was rather "forwarded to the municipality." (*Id.*) American banks did not investigate the "fraud and misuse of investor funds." (*Id.*)

Plaintiff further alleges that Israeli fundraising in the United States has caused the violation of his rights because funds from "U.S. bond offerings and sovereign issuances are deposited into the unified state budget. From that budget, all governmental activities are financed—including the judicial system, welfare authorities, police, execution offices, legal aid, and all other armes of the Enterprise that acted against Plaintiff." (*Id.* at 25.)

Plaintiff asserts that the harms caused by Defendants persist to this day, as he currently does not have an active bank account, is without legal representation, and is unhoused "without basic means of subsistence." (*Id.*)

Plaintiff seeks "1.2 Quadrillion" Israeli New Shekels.

## DISCUSSION

### A. Claims on behalf of Jacobs Power Ltd.

As a non-attorney, Plaintiff cannot assert claims on behalf of Jacobs Power Ltd., which he describes as "a private holding company registered in Israel, whose business is any lawful business defined by law." (ECF 16, at 9.) While "some courts allow sole proprietorships to proceed *pro se* [because] a sole proprietorship has no legal existence apart from its owner," *Lattanzio v. COMTA*, 481 F.3d 137, 140 (2d Cir. 2007) (citation omitted), courts generally do not allow corporations, partnerships, associations, and other artificial entities to appear in court without an attorney, *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202-03 (1993). "[S]hareholders and members of limited liability companies—even sole shareholders and sole members—do not have standing to sue for wrongs to the corporate entity."

*RIGroup LLC v. Trefonisco Mgmt. Ltd.*, 949 F. Supp. 2d 546, 552 (S.D.N.Y. 2013), *aff'd*, 559 F. App'x 58 (2d Cir. 2014). This rule applies to prohibit limited companies, like Jacobs Power Ltd., from proceeding without counsel in federal court. *See, e.g.*, *Weaver v. State of N.Y.*, 7 F. Supp. 2d 234, 236 (W.D.N.Y. 1998) (dismissing claims brought by *pro se* litigant on behalf of limited company for failing to retain counsel); *Penguin Books USA, Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96-CV-4126 (RWS), 1997 WL 26720, at *1 (S.D.N.Y. Jan. 24, 1997) (ordering limited company to retain counsel); *Tabbs v. New Rochelle Neighborhood Revitalization Corp.*, No. 94-CV-4753 (DLC), 1995 WL 546950, at *1 (S.D.N.Y. Sept. 14, 1995) (dismissing claims brought by *pro se* litigant on behalf of JMEB Landers, Ltd. for failing to obtain counsel).

The Court therefore dismisses without prejudice any claims Plaintiff seeks to bring on behalf of Jacobs Power Ltd.

**B. Plaintiff's own claims are frivolous as a legal matter**

The IFP statute requires a court to dismiss a complaint, or a portion of the complaint, if it determines that the action is frivolous or malicious under 28 U.S.C. §1915(e)(2)(B)(i). "[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless . . . ; or (2) the claim is based on an indisputably meritless legal theory." *Livingston*, 141 F.3d at 437 (internal quotation marks and citation omitted)); *see also Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989) (A claim is frivolous when it "lacks an arguable basis either in law or in fact.").

"[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). A complaint is "'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless' − that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'" *Gallop v. Cheney*, 642 F.3d 364, 368

(2d Cir. 2011) (quoting *Denton*, 504 U.S. at 32-33) (finding as frivolous and baseless allegations that set forth a fantastical alternative history of the September 11, 2001 terrorist attacks).

Moreover, a court has "no obligation to entertain pure speculation and conjecture." *Id.* Rather, a complaint must include a factual basis in support of the complaint's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level[.]" (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

Plaintiff's legal claims are all premised upon his belief that dozens of defendants in multiple countries—including the State of Israel, government agencies, drug companies, medical associations, banks, and judges—have conspired to harm him in order to prevent him from marketing an alternative fuel formula. In the second amended complaint, Plaintiff catalogues 25 years of negative experiences he has had with the Israeli criminal and civil justice systems and child welfare authorities, and asserts, without any factual support, that his misfortunes were the result of a coordinated criminal enterprise between the defendants. Plaintiff's allegations of any coordinated criminal activity among the dozens of defendants consist of conclusory allegations and speculation concerning coordination of activity that are "wholly incredible." *See Denton*, 504 U.S. at 33 (holding that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"). The Court finds that Plaintiff does not provide any plausible factual support for his claims and that they rise to the level of the irrational. *See Livingston*, 141 F.3d at 437. The Court therefore dismisses the complaint as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i). *See Neitzke*, 490 U.S. at 323 (noting that the IFP

statute "authoriz[es] *sua sponte* dismissal of an *in forma pauperis* complaint "only if the petitioner cannot make any rational argument in law or fact which would entitle him or her to relief").

### C. Leave to amend denied

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Plaintiff's complaint, various "emergency" motions, and 414-page second amended complaint do not suggest that he is in possession of facts that would cure the identified deficiencies. *See Gallop*, 642 F.3d at 369 (holding that district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend.

## CONCLUSION

The Court dismisses the second amended complaint, filed IFP under 28 U.S.C. § 1915(a)(1), as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court directs the Clerk of Court to enter judgment dismissing this action.

SO ORDERED.

Dated: September 21, 2026
New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge